UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No. 1:23-CR-385 |
| v. : | |
| : | |
| BAYO BAKARE, : | |
| : | |
| Defendant. : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Bayo Bakare to a sentence of 120 months of incarceration, followed by 10 years of supervised release.

### I.   Factual and Procedural Background

On April 15, 2023, members of the United States Probation Office (USPO), United States Marshals Service (USMS), Court Services and Offender Supervision Agency (CSOSA), and a member of the Federal Bureau of Investigation Child Exploitation and Human Trafficking Task Force (CEHTTF) conducted compliance checks of sex offenders registered within Washington, D.C.  The compliance checks were conducted on specific individuals based upon those individuals' noncompliance with sex offender registry and supervised release requirements.

Defendant Bayo Bakare is currently a registered sex offender in Washington, D.C. due to his prior conviction of "Distribution of Child Pornography, in violation of 18 U.S.C. § 2252(a)(2)" on November 9, 2016 (Case No. 16-CR-129).  Defendant Bakare was sentenced to sixty (60)

1

months of incarceration and one hundred and twenty (120) months of supervised release, which included the following special conditions:

    a.    Sex offender registration

    b.    Sex offender assessment and treatment

    c.    Contact restrictions

    d.    Search

    e.    Computer / internet search / monitoring

    f.    Substance abuse treatment

    g.    Substance abuse testing

Defendant Bakare's supervised release began on May 28, 2020. It was scheduled to conclude on May 27, 2030. During the April 15, 2023 sex offender compliance checks, Defendant Bakare was contacted at his residence, 3201 8th Street #1212, Northeast, Washington, D.C. 20017, due to reported noncompliance by the USPO for "deception on polygraph in the area of viewing pornography."

During the compliance check on Defendant Bakare, a member of the USPO, a member of CSOSA, and a member of CEHTTF were greeted by Defendant Bakare at the front door of his residence. The team then entered the apartment to conduct the compliance check. Defendant Bakare indicated that he needed to retrieve clothes from his bedroom, and Defendant Bakare was followed by the USPO member to the bedroom. Once in the bedroom, the USPO member observed a Galaxy A11 cellular phone, and an Apple iPhone 13 Pro Max plugged into a wall charger.

Defendant Bakare acknowledged that the room with the Galaxy A11 cellular phone and the Apple iPhone 13 Pro Max was his bedroom, and further acknowledged that both phones belonged to him. Defendant Bakare confirmed that the Galaxy A11 was the cellular phone that

was monitored by USPO, and Defendant Bakare further stated that the Apple iPhone 13 Pro Max was not monitored by USPO. Because the Apple iPhone 13 Pro Max was not monitored by USPO, Defendant Bakare was therefore not allowed to possess it per his conditions of supervised release.

The USPO member subsequently seized the Apple iPhone 13 Pro Max due to Defendant Bakare's illicit possession of it. The Apple iPhone 13 Pro Max was submitted for a forensic extraction by USPO on April 18, 2023. The extraction was subsequently conducted by a USPO forensic examiner.

On September 26, 2023, the USPO member reported to a law enforcement that child sexual abuse material (CSAM) had been located on Defendant Bakare's Apple iPhone 13 Pro Max during the forensic examination of the device. Specifically, the USPO forensic examiner had reported that six (6) videos clearly depicting child exploitation and an additional thirty (30) videos depicting likely child exploitation were found on the Apple iPhone 13 Pro Max. A forensic analysis report was prepared by the USPO forensic examiner, which contained the following descriptions of CSAM located on Defendant Bakare's Apple iPhone 13 Pro Max:

   a.   Video named "7779dab6f23b634dae585862a892fce1" is thirty-one (31) seconds in length and depicts a prepubescent minor of unknown gender with his/her mouth open while an adult male's erect penis ejaculates on the child's face.

   b.   Video named "9dc204bd6f42d7178605a39478f3d808" is twenty-six seconds in length and depicts a prepubescent, fully nude, female. She is tied to a bed while an offscreen individual applies a vibrating device to the prepubescent female's vagina for the duration of the video.

   c.   Video named "63e8b114b030521222a31f7d6662401f" is forty-three (43) seconds in length and depicts two clothed prepubescent boys kissing. Approximately twenty (20)

3

seconds into the video, one of the boys pulls down his pants, exposing his penis, and the other boy puts his mouth onto the boy's penis for the remainder of the video.

The USPO forensic examiner noted that, within the contents of the Apple iPhone 13 Pro Max, the videos depicting the sexual abuse of children were located within cache folders associated with the online application Discord, and contained the modification date May 22, 2022.

A member of the USPO interviewed Defendant Bakare regarding his possession of the Apple iPhone 13 Pro Max, the child exploitation material discovered on the device, and his truthfulness prior to being found in possession of the Apple iPhone 13 Pro Max.  Defendant Bakare advised that he had not been truthful with his probation officer about his prior possession of the iPhone, that he believed he had deleted the child exploitation material after looking at it, and that he felt remorseful for what he had done.  Defendant Bakare acknowledged that the Apple iPhone 13 Pro Max was his and that he had accessed and viewed CSAM while utilizing the Apple iPhone 13 Pro Max.

On October 7, 2023, law enforcement presented an affidavit in support of a search warrant for the Apple iPhone 13 Pro Max and for the forensic extraction conducted by USPO of the Apple iPhone 13 Pro Max to United States District Court of the District of Columbia, and the search of the device and extraction was authorized.

Law enforcement reviewed the contents of the USPO forensic extraction and located the CSAM videos reported by the USPO forensic examiner.  Law enforcement confirmed that the Apple iPhone 13 Pro Max seized from Defendant Bakare's residence on April 15, 2023 does in fact contain at least 12 videos depicting the sexual abuse of children.  Additionally, the files appear to have been accessed through Discord, and viewed through a video player on the Apple iPhone

13 Pro Max on May 22, 2022. The files included the identified files described above, as well as the following:

    a.    Video named "68dde4f15b7945dc6024eff29fdb8cd4" is an eleven-second (11) video that depicts an adult male's hand holding a prepubescent child's head against an adult male's erect penis. The child appears to be asleep, and the adult male is pressing the erect penis into the child's mouth. The adult male eventually ejaculates inside of the child's mouth and the child appears to wake up.

    b.    Video named "06574ac1a049342554ce418f3718c975" is a twenty-nine second (29) video that depicts a prepubescent female, fully nude, on her knees, facing away from an adult male with his nude, erect penis visible. The little girl can be seen bending backwards and having her mouth penetrated by the adult male's erect penis.

    c.    Video named "31bd7905e205f98b09690a7e1edbccd7" is a forty-seven (47) second video that depicts two completely nude, prepubescent boys standing in what appears to be a bathroom. One boy is observed penetrating the other boy's anus with his penis.

    d.    Video named "7779dab6f23b634dae585862a892fce1" is a thirty-one (31) second video that depicts a prepubescent toddler laying on top of a piece of furniture. An adult male's erect penis is observed in front of the toddler's face. The adult male ejaculates onto the child's face, specifically into the child's eye and then penetrates the child's mouth with his erect penis. The toddler appears to be in distress due to the male ejaculate in the toddler's eye.

A review of the "notes" saved to the Apple iPhone 13 Pro Max led to the identification of two "notes" that listed a total of ten Mega links that were uploaded on May 31, 2021 and June 1, 2021. A member of law enforcement attempted to access all ten links and found that Mega had

removed the content from all links because they all had "been reported to contain objectionable material, such as Child Exploitation Material, Violent Extremism, or Bestiality."

The Defendant pled guilty to one count of Access with Intent to View Child Pornography on February 8, 2023. The government now files this Sentencing Memorandum, and respectfully requests that the Court impose a sentence of 120 months of incarceration, to be followed by 10 years of supervised release.

## II.     The Sentencing Guidelines and Guidelines Analysis

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in *Blakely v. Washington*, 542 U.S. 961 (2004). As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory, 18 U.S.C. § 3553(b)(1). *Booker*, 543 U.S. at 244.

In post-*Booker* cases, the Supreme Court has instructed that a district court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."). After giving both parties an opportunity to argue for an appropriate sentence, the district court should then consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). *Id.* These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant" (18 U.S.C. § 3553(a)(1)); the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment (18 U.S.C. § 3553(a)(2)); the kinds of sentences available (18

U.S.C. § 3553(a)(3)); the Sentencing Guidelines and related Sentencing Commission policy statements (18 U.S.C. § 3553(a)(4) and (a)(5)); the need to avoid unwarranted sentencing disparities (18 U.S.C. § 3553(a)(6)); and the need to provide restitution to any victims of the offense (18 U.S.C. § 3553(a)(7)).

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated the Defendant's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---:|
| Base Offense Level (U.S.S.G. § 2G2.2(a)(1)) | 18 |
| Specific Offense Characteristics | |
| Depictions of minors under 12 (U.S.S.G. §2G2.2(b)(2)) | +2 |
| Sadistic or masochistic conduct or infant/toddler (U.S.S.G. §2G2.2(b)(4)(A)) | +4 |
| Use of a computer (U.S.S.G. §2G2.2(b)(6)) | +2 |
| Involved 600+ images (U.S.S.G. §2G2.2(b)(7)(D)) | +5 |
| Acceptance of responsibility (U.S.S.G. §3E1.1(a) & 3E1.1(b)) | -3 |
| Total Adjusted Offense Level | 28 |

*See* PSR at ¶¶ 30-43.

The U.S. Probation Office calculated the Defendant's criminal history as a Category III, which is not disputed. *Id.* at ¶ 53. Accordingly, the U.S. Probation Office calculated the Defendant's total adjusted offense level at 28, and his corresponding Guidelines imprisonment range at 97 to 121 months; however, due to the mandatory minimum sentence he is facing in this case, the Guidelines range adjusts to 120 to 121 months. *Id.* at ¶ 114.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying

with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that *significantly* increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

      Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide a helpful benchmark, and remain a necessary factor for the Court's consideration.

### III.  A Mandatory Minimum Sentence of 120 Months Accurately Reflects the 18 U.S.C. § 3553(a) Factors

In determining a reasonable sentence, the Court must consider the factors listed in 18 U.S.C. § 3553(a).[1] These factors include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed –

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; and

(3) the kinds of sentences available;

(4) the applicable sentencing guidelines range for the offense;

(5) pertinent policy statements issued by the U.S. Sentencing Commission;

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). A district court, however, "need not consider every § 3553(a) factor in every case." *In re Sealed Case*, 527 F.3d 188, 191 (D.C. Cir. 2008); *see also United States v. Fry*, 851 F.3d 1329, 1332 (D.C. Cir. 2017).

### A. The Nature and Circumstances of the Offense

---

[7] Since the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), the Guidelines serve only an advisory function. *Id.* at 245. Nevertheless, even in a post-*Booker* world in which the Guidelines are not binding, the sentencing court 'must calculate and consider the applicable Guidelines range" as its starting point. *Booker* did not change "how the Guidelines range is to be calculated." *United States v. Mattea*, 895 F.3d 762, 766 (D.C. Cir. 2018) (internal citations and quotations omitted).

The Defendant's conduct in this case is extremely serious. Despite a prior conviction, significant period of incarceration, and ongoing sex offender treatment, the Defendant knowingly obtained an illicit device, purposefully hid it from his probation officer, and used it to seek out, access, and view child pornography.

What makes the Defendant's criminal conduct so egregious is the fact that he has, multiple times now, perpetrated against the most vulnerable members of our society – children. Children captured in images and videos depicting their sexual abuse are traumatized and victimized in the worst way imaginable at the time the images were created, and they are re-victimized and re-traumatized each and every time an individual views the images for their own sexual gratification. As eloquently explained by the Sixth Circuit in a child pornography case:

> . . . we have numerous victims in a case like this, not one victim. Every image of a child, every image of a non-adult engaged in any type of sexual activity or any type of pose without clothing or any type of exploitation constitutes an additional case of victimizing a child. Without a demand for that type of information and that type of viewing from persons like this defendant, we don't know how many child abuse cases we could prevent. And as long as there is a demand to purchase images of child pornography, there is going to be an unending stream of child abuse of . . . children who are forced into these roles.
> . . . every image has a child who has been exploited and abused, and that is the concern I have. It is the concern that I have when people are engaged in serially doing this, the effect it has on children throughout the world and the effect it has on their future lives.

*See United States v. Miller*, 665 F.3d 114, 121-22 (6th Cir. 2011) (quoting the district court) (rejecting an attack on the child pornography sentencing guidelines and highlighting the grave harm caused to the victims depicted in child pornography images and the evidence that traffickers and possessors of child pornography are the impetus for the creation of more sexual abuse of minors).

Each one of the images and videos the Defendant purposefully and sneakily accessed and viewed with his illicit device represents an innocent child victim who had the worst moments of their lives forever memorialized and spread to countless offenders all over the world via the internet. *See Blinkinsop*, 606 F.3d 1110, 1118 (9th Cir. 2010) (finding that "[t]he children involved in pictorial and cinematic pornography additionally endure ongoing harm because their images have been preserved in a permanent medium"). In *New York v. Ferber*, the U.S. Supreme Court noted:

> [P]ornography poses an even greater threat to the child victim than does sexual abuse or prostitution.  Because the child's actions are reduced to a recording, the pornography may haunt him in future years, long after the original misdeed took place.  A child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography.

458 U.S. 747, 759 n.10 (1982), *quoting* Shouvlin, *Preventing the Sexual Exploitation of Children: A Model Act*, 17 Wake Forest L.Rev. 535, 545 (1981).

The conduct that brings the Defendant before the Court was not a one-time occurrence, nor a mistake. Rather, this Defendant has demonstrated to the Court that the only thing his prior sentence, incarceration, and punishments have done is make him more careful to evade law enforcement.  This offender intentionally and secretly obtained an electronic device, his that device from law enforcement, and then went on to find, collect, and view child pornography, which he then sneakily attempted to delete.  He was only caught when law enforcement showed up at his door unexpectedly when he did not have time to hide the device.  The Defendant has been previously convicted of similar conduct in the past, and it did not stop him from doing so again, even while on supervised release.  Given the extremely serious nature of the Defendant's criminal conduct, the significant mandatory minimum sentence of 120 months of incarceration is appropriate appropriate.

### B. The History and Characteristics of the Defendant

The Defendant's history is alarming, especially given that he has a prior conviction for Distribution of Child Pornography. The facts underlying his 2016 conviction are also extremely concerning. *See* Attachment 1, Statement of Offense. In that Distribution of Child Pornography case, the Defendant communicated extensively with an undercover law enforcement officer (UC) about his sexual interest in children, his own abuse of a seven-year-old girl, his interest in child pornography, and his "EXTREME" desire to sexually abuse a purported nine-year-old girl. In addition to sharing a large volume of child pornography, the Defendant actually traveled to meet the UC and in order to sexually abuse the purported prepubescent girl. As a result of this prior conviction, the Defendant was sentenced to 60 months' incarceration. He was detained from approximately February 2016 through May 2020. Within approximately one year of his release, despite the strict conditions of his supervised release, including sex offender treatment and electronic device monitoring, there is evidence to suggest the Defendant was downloading Mega links that likely contained child pornography. In May 2022, less than two years after his release from incarceration for Distribution of Child Pornography, the Defendant was actively finding and viewing numerous videos depicting the sexual abuse of prepubescent children on an electronic device that he kept hidden from his probation officer. The Defendant's criminal history, including his blatant disregard for the terms and conditions of his supervised release, demonstrate just how serious and dangerous this Defendant is.

Moreover, as explained throughout the Presentence Report, even during the same time he was reoffending, the Defendant simultaneously demonstrated that he can appear as nothing but "successful" on supervised release. The Defendant's ability to live such a "double life" is extremely concerning, especially in light of these child exploitation charges, and his own prior

12

claims about actually sexually abusing a young girl.  The Defendant is in fact capable of being a functioning, contributing member of society, and he did successfully complete drug/alcohol and sex offender treatment.  He did all of this, and managed to secure housing and employment, while still criminally offending and purposefully and sneakily accessing and viewing child pornography.  This leaves the government and should leave the Court to question what the Defendant is capable of doing behind closed doors.

In light of this offender's criminal history, and the fact that rehabilitative programs simply have not "fixed" this Defendant, the significant mandatory minimum sentence is necessary.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The sexual exploitation of children, including online discussions about abuse, as well as the downloading, distributing, receiving, viewing, and possession of child sexual abuse material, has devastating consequences for the children depicted in these images and videos. Once they find their way onto the Internet, images and videos depicting the sexual abuse of a child will circulate in perpetuity because individuals make the repetitive and purposeful decision to collect, save, and trade such images and videos for their own sexual gratification.

Furthermore, consumers and distributers of child pornography, like the Defendant, create a market and demand for the production of these images and videos, which depict the sexual abuse and exploitation of real children. These consumers and distributers contribute to the cycle of abuse and are in part responsible for the harm suffered by children used to produce the images and videos in their collections. *See United States v. Goff,* 501 F.3d 250, 259-60 (3d Cir. 2007) ("Children are exploited, molested, and raped for the prurient pleasure of [defendant] and others who support suppliers of child pornography"); *see also United States v. Accardi*, 669 F.3d at 345 (D.C. Cir. 2012) (emphasizing that "child pornography creates an indelible record of the children's

13

participation in a traumatizing activity, and the harm to the child is only exacerbated by the circulation of the materials.") In *United States v. Goldberg,* the Seventh Circuit stated:

> The district judge was influenced by the erroneous belief that a sentence affects only the life of the criminal and not the lives of his victims. Young children were raped in order to enable the production of the pornography that the defendant both downloaded and uploaded-both consumed himself and disseminated to others. The greater the customer demand for child pornography, the more that will be produced. [Citations omitted].

491 F.3d 668, 672 (7th Cir. 2007).

When enacting mandatory minimum penalties for those who produce and traffic in the sexual abuse and exploitation of children, Congress similarly described the evil of child pornography:

> [W]here children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years . . . [The] existence of and traffic in child pornographic images creates the potential for many types of harm in the community and presents a clear and present danger to all children . . . it inflames the desires of . . . pedophiles . . . who prey on children, thereby increasing the creation of and distribution of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials.

Child Pornography Prevention Act of 1996, Pub.L. No. 104-208, § 121, 110 Stat. 3009, 3009-27 (1996). There is perhaps no greater invasion of privacy than that caused by the dissemination of child pornography. With a click of the button on a camera, the sexual abuse of these children is memorialized forever. It is terrible enough that a child must live with the memory of his or her initial abuse. It is hard to even comprehend how that child could then learn to cope with the fact that strangers everywhere are using the worst moments of that child's life to sexually gratify themselves and that he or she can do nothing to stop them from continuing to do so. The only

recourse that these children have is the strong enforcement of the laws that hold these offenders accountable for the tremendous damage they have inflicted upon countless child victims.

The Defendant created a market and demand for materials depicting the rape and torture of real, and very young, children. Therefore, with respect to 18 U.S.C. § 3553(a)(2)(A), a sentence of 120 months of incarceration accurately reflects the seriousness of the Defendant's conduct, promotes respect for the law, and provides just punishment for the Defendant's offense.

### D. The Need for the Sentence to Afford Adequate Deterrence and to Protect the Public from Future Crimes of the Defendant

Deterrence and protecting the public from future crimes of the Defendant is of particular import for three reasons. First, serious penalties for child pornography offenders decrease the number of participants in the market, which in turn decreases the need for its production.

> The greater the customer demand for child pornography, the more that will be produced. Sentences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor. The logic of deterrence suggests that the lighter the punishment for downloading and uploading child pornography, the greater the customer demand for it and so more will be produced.

*Goldberg*, 491 F.3d at 672.

Second, both Congress and the courts have recognized the high recidivism rates for these types of offenders. *See* Blaisdell, Krista, Note, *Protecting the Playgrounds of the Twenty-First Century: Analyzing Computer and Internet Restrictions for Internet Sex Offenders*, 43 Val.U.L. Rev. 1155, 1192, n.150 (2009) (compiling congressional statements regarding the high risk of recidivism among child sex offenders); *Accardi*, 669 F.3d at 346 (noting that "a number of circuits have upheld [sentences] . . . for defendants convicted of possession of child pornography based on the same general concerns about recidivism") (citing *United States v. Cope*, 527 F.3d 944, 952 (9th Cir. 2008) (noting that, there, the "sentence [was based] on general concerns about recidivism

15

and protection of the public."))); *United States v. Pugh*, 515 F.3d 1179, 1201 (11th Cir. 2008); *United States v. Allison*, 447 F.3d 402, 405-06 (5th Cir. 2006); *United States v. Garthus*, 552 F.3d 715, 720 (7th Cir. 2011) ("We need evidence-driven law just as we need evidence-driven medicine . . . statistical analysis of sex crimes has shown that the best predictor of recidivism is not deportment at an interview but sexual interest in children") (citations omitted)).

Third, there is an undeniable link between sexual contact offenses and the receipt and distribution of child pornography. "An offender's pornography and erotica collection is the single best indicator of what he wants to do." *See* Lanning, Kenneth V., *Child Molesters: A Behavioral Analysis – For Professionals Investigating the Sexual Exploitation of Children*, Office of Juvenile Justice and Delinquency Prevention, Fifth Ed. 2010, at 107.

This recidivist offender has been actively seeking out, discussing, and sharing material depicting the sexual abuse of children for a lengthy period of time. A prior conviction, incarceration, treatment, and supervised release has not stopped him from reoffending. For all of these reasons, a significant sentence, as contemplated by Congress, is necessary to protect the public from further crimes by this Defendant.

### F. The Need to Avoid Unwarranted Sentence Disparities among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct

Section 3553(a)(6) directs courts to consider avoiding *unwarranted* disparities among defendants "with similar records who have been found guilty of similar conduct." It "does not require the district court to avoid sentencing disparities between defendants who might not be similarly situated." *United States v. Mattea*, 895 F.3d 762, 768 (D.C. Cir. 2018) (quoting *United States v. Guillermo Balleza*, 613 F.3d 432, 435 (5th Cir. 2010). Here, the government's recommended sentence is within the Sentencing Guidelines range, a sentence that the Defendant agreed was a reasonable sentence in his Plea Agreement.

Imposing a Guidelines sentence of 120 months of incarceration in this case would not create an unwarranted disparity. This is the Defendant's second conviction related to his consumption of child pornography. He was on supervised release for Distribution of Child Pornography at the time he committed the instant offense. Clearly, a significant sentence is appropriate given these egregious circumstances.

When an offense is uniquely serious, courts will consider the need to impose "stiffer sentences" that "justif[y] the risk of potential disparities." *United States v. Jones*, 846 F.3d 366, 372 (D.C. Cir. 2017). Given all of these factors, a sentence as the Government is recommending avoids creating an unwarranted sentencing disparity between defendants with similar records who have been convicted for similar conduct.

### IV. The Victims are Entitled to Restitution

Prior to December 7, 2018, Title 18 U.S.C. § 2259 directed that, "notwithstanding section 3663 or 3663A, and in addition to any other civil or criminal penalty authorized by law, the court shall order restitution for any offenses under this chapter." 18 U.S.C. § 2259(a); *United States v. Hite*, 113 F. Supp. 3d 91, 94 (D.D.C. 2015) ("Pursuant to 18 U.S.C. § 2259, the victims of certain federal crimes, including possession of child pornography, are entitled to mandatory restitution."). Restitution was defined to include "the full amount of the victim's losses," which includes any costs incurred by the victim for:

    (A) Medical services relating to physical, psychiatric, or psychological care;

    (B) Physical and occupational therapy or rehabilitation;

    (C) Necessary transportation, temporary housing, and child care expenses;

    (D) Lost income;

    (E) Attorneys' fees, as well as other costs incurred; and

(F) Any other losses suffered by the victim as a proximate result of the offense.

18 U.S.C. § 2259(b)(3); *see also United States v. Hite*, 113 F. Supp. 3d 91, 94 (D.D.C. 2015). The Court may not decline to issue an order under this section because of the economic circumstances of the defendant. 18 U.S.C. § 2259(B)(i).

In *Paroline v. United States*, 572 U.S. 434 (2014), the United States Supreme Court faced a circuit split over the interpretation of 18 U.S.C. § 2259, specifically over "how to determine the amount of restitution a possessor of child pornography must pay to the victim whose childhood abuse appears in the pornographic materials possessed." *Paroline*, 572 U.S. at 439. In *Paroline*, the defendant possessed two images of the victim who was seeking restitution. The Court's answer to this question involved three steps. First, *Paroline* held that, because the statute defined a "victim" as someone "harmed as a result" of the offense, restitution under § 2259 was proper "only to the extent the defendant's offense proximately caused a victim's losses." *Id*. at 448. Second, the Court held that "proximate cause" under § 2259 did not require strict but-for causation. *Id*. at 457-59. Recognizing that under the circumstances of most child pornography possession cases – where losses resulted from harm caused by the trafficking of a victim's images by numerous "geographically and temporally distant offenders acting independently, and with whom the defendant had no contact," *id*. at 455, - the Court held:

> In this special context, where it can be shown that a defendant possessed a victim's images and that a victim had outstanding losses caused by the continuing traffic in those images but where it is impossible to trace a particular amount of those losses to the individual defendant by recourse to a more traditional causal inquiry, a court applying § 2259 should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses.

*Id*. at 458. The Court made clear that, where the victim's losses are "the product of the acts of thousands of offenders," a restitution order should not be "too severe" but must not be merely "a

token or nominal amount." *Id.* at 459. That is, in part, because a restitution order under § 2259 serves "twin goals," the first being to "help[] the victim achieve eventual restitution for all her child-pornography losses" and second to "impress[] upon offenders the fact that child pornography crimes, even simple possession, affect real victims." *Id.* Third, the Court provided sentencing courts the following guidance for how to determine the proper amount of restitution under this standard. *Id.* The Court noted that a sentencing court's goal should be to assess "the significance of the individual defendant's conduct in light of the broader causal process that produced the victim's losses," taking into account any "available evidence." *Id.* The Court emphasized that there is no "precise mathematical inquiry" governing this determination and that district courts must exercise "discretion and sound judgment" in fashioning restitution awards. *Id.*

The Court suggested several factors to be considered, including: (1) the number of defendants convicted of possessing the victim's images; (2) the number of future offenders likely to be caught and convicted; (3) whether the defendant had any role in the initial production of the images; (4) whether the defendant reproduced or distributed the images; (5) how many images the defendant possessed; and (6) "other facts relevant to the defendant's relative causal role." *Id.* "These factors need not be converted into a rigid formula, especially if doing so would result in trivial restitution orders. They should rather serve as rough guideposts for determining an amount that fits the offense." *Id.* at 460.

Congress has since amended Section 2259 to both codify *Paroline*'s basic approach and to set a restitution floor of $3,000.00. *See* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299, 132 Stat. 4383 (December 7, 2018). As detailed in the Restitution Request materials submitted to this Court under seal, some of the victims depicted in the images and videos the Defendant uploaded, viewed, and possessed are seeking restitution

for costs associated with attending psychotherapy and/or counseling, medications, loss of income, loss of housing, and for various medical expenses. *See United States v. Monzel*, 930 F.3d at 486 (D.C. Cir. 2019) (noting that *Paroline*'s § 2259(b) restitution calculation is based on the defendant's "contribution to [the victim's] '*general* losses,'" and that the district court's calculation should be "a matter of 'discretion and sound judgment,'" considering the *entire totality* of the defendant's contributions, rather than a narrow, unnecessarily precise "exercise in long division") (emphasis added) (citing *Paroline*, 572 U.S. at 459-60)). At this time, none of the known victims from the defendant's collection are seeking restitution. If that changes in the next 90 days, the government respectfully requests that it may seek restitution on behalf of any of those victims.

V.   **Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, each of these factors requires a lengthy sentence of incarceration within the sentencing guideline range. Based on these factors, the government respectfully requests that the Court impose a mandatory minimum and Guidelines sentence of 120 months of incarceration followed by a period of 10 years of supervised release.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:   */s/ Rachel Forman*
RACHEL FORMAN
VA Bar Number 89169
Assistant United States Attorney
U.S. Attorney's Office
601 D Street, NW
Washington, D.C.
Office: 202-252-6916
Rachel.forman2@usdoj.gov